# Gary L. Cutler, P.C.
Attorney-At-Law
160 Broadway, 10th Floor, East Building
New York, NY  10038

Tel.:  (212) 227-4358
Cell:  (917) 628-9062
Email: garycutlerlaw@gmail.com

November 21, 2023

**Via ECF and Email**

Hon. Joan M. Azrack
United States District Court
Eastern District of New York
Long Island Courthouse, Courtroom 920
100 Federal Plaza
Central Islip, NY  11722

Re:  United States of America v. Romean Brown, 1:22-cr-00087(JMA)

Dear Judge Azrack:

     I represent Defendant Romean Brown in the above-captioned case.  Sentencing is scheduled in this case for December 12, 2023 at 3 pm.  Please consider this letter as Mr. Brown's Sentencing Memorandum.

     On June 1, 2023, Mr. Brown pleaded guilty to Count One of the Indictment charging him and the other defendants with devising a scheme and artifice to defraud the New York State Department of Labor ("Department of Labor") and to obtain money and property from the New York State Department of Labor by means of one or more false pretenses, representations and promises and for the purpose of executing such scheme used the mail and wire communications. (Presentence Investigation Report ("PSI," ¶ 1).

     While the Government estimates that the total loss caused by all eleven defendants is $522,746, the losses caused by claims submitted by Mr. Brown amount to only $15,006.  (PSI, ¶17).  The crime allegedly occurred from March 2020 to October 2021.  In this time period Defendant was age 21 to age 22.  (PSI, ¶ 1; p. 2, top).  Mr. Brown has no prior convictions, arrests or known criminal conduct.  (PSI, ¶¶ 46-50).  Together, these factors and others to be discussed, indicate that a time served sentence is appropriate for Mr. Brown.  We respectfully request a sentence of time served with no additional supervised release, which is allowed by 18 U.S.C. § 3583(1).  PSI, ¶ 89.

## Sentencing Guideline Calculation

While the sentencing guidelines are 33 to 41 months, the Probation Department recommends a below guideline sentence of 26 months. (U.S. Probation Department Sentence Recommendation, page one, paragraph one; page three, third paragraph). The sentencing guidelines calculation of 22 with a criminal history score of I results in a guideline range of 41 months to 51 months (PSI, ¶¶ 88). Mr. Brown accepted responsibility and pleaded early enough to warrant this three point reduction, which is embodied in the Total Offense Level of 22. (See PSI, ¶¶ 43, 44).

All of the defendants stipulated with the Government to an additional two point reduction based on a global plea reduction or global disposition. (PSI, ¶ 102). According to the PSI, this global plea reduction would require a downward departure pursuant to Policy Statement 5K2.0. (PSI, ¶ 102). Such a departure would bring the Total Offense Level for Mr. Brown to 20, and provide the resulting guideline range of 33 months to 41 months. We respectfully request that Your Honor accept the two point global plea reduction, as this informed Mr. Brown's plea.

## The Sentencing Statute, 18 U.S.C. § 3553(a)

The Sentencing Guidelines are but one factor the Court is to consider in imposing sentence. 18 U.S.C. § 3553(a) is the primary sentencing provision post-Booker. The statue prescribes imposing "a sentence sufficient but not greater than necessary, to comply with the purposes set forth . . . (in the sentencing statute)." The statute presents numerous points for the Court to evaluate in passing sentence.

**The History and Characteristics of Defendant**
**The Nature and Circumstances of the Offense**

### Letters of Support

Letters of Support provide perceptive insight from those who know a defendant. The Letters of Support are summarized below and are attached to this letter.

### Rosalie Stewart

Ms. Stewart is Romean's aunt. She characterizes Romean as "a very smart, loving and a very charismatic young man (who) has his entire future ahead of him." She believes that "Romean should be given a second chance to do things the right way." She states that "Romean has learned his lesson . . . he wants to make something of himself." Ms. Stewart concludes, " it would be a great opportunity to see him be the man that he was born to be." Defendant's Exhibit A ("Def Ex. A"), attached to this letter.

### Connor Campbell

Connor Campbell is Romean's younger cousin. Mr. Campbell states that Romean "has been a true example for me as a young man. He is the big brother I have always wanted." He

describes Romean as "respectful, reliable, and trustworthy." He respectfully asks the Court, "Please consider allowing Romean to show us that he has learned from his mistake and is willing to make the necessary changes to function in our society as an adult." Def. Ex. B.

### Gabriele Addison Stewart

Ms. Stewart is 10 years old and Romean's cousin. She states that Romean has been kind and loving towards her. Romean picked Ms. Stewart up from summer camp and and helped her with her projects and homework. Ms. Stewart says that Romean always helped her to do her best. Def. Ex. C.

### Tyler Cowell

Tyler Cowell is Romean's cousin. Mr. Cowell describes Romean as "kind, caring, fun, loving, respectful, helpful, trustworthy and well-mannered." He also states that "Romean is not a bad person, he made a bad choice." Mr. Cowell respectfully requests that the Court give Romean leniency. Def. Ex. D.

### Brinelle Hemmings

Ms. Hemmings states that Romean "was always a selfless and caring person oftentimes putting others before himself." She states that Romean gave back to those in need whether it was food or clothing. Ms. Hemmings says that Romean is not a bad person and she believes that he deserves a second chance to get his life on track. Ms. Hemmings points out that Romean has used his time in jail to gain knowledge through the books he reads actively. She says that Romean has become a Muslim in jail and he prays and fasts daily. Def. Ex. E.

### Lashay Turner

Ms. Turner states that she has known Romean for five years. She says that "Romean is a great kid at heart, very family oriented and is a good person." From her conversations with Romean, Ms. Turner says that "while incarcerated he is making momentous changes for a better and safer future, we talked about furthering his education and obtaining a job." Ms. Turner asks for leniency for Romean. Def. Ex. F.

### Nickesha Barnett-Morgan

According to Nickesha Barnett-Morgan, Romean is Ms. Barnett-Morgan's best friend's nephew. She has known Romean for over 15 years. Ms. Barnett-Morgan states that "Romean has always been a jovial young man." Ms. Barnett-Morgan states further that "(h)e was always loving, respectful, well mannered and helpful." Ms. Barnett-Morgan respectfully asks the Court to give Romean "leniency and an opportunity to set his life back on the right track." Def. Ex. G.

Offender Characteristics From the Presentence Investigation Report

Defendant was born in Jamaica. (PSI, ¶ 53). He came to the U.S. with his mother when he was one year old. (PSI, ¶ 59). Defendant was naturalized after he entered the U.S. (See PSI, ¶ 59). Romean does not know who his father was. (PSI, ¶ 53). No one stepped into a father figure role for Romean and he was raised by his mother alone. (PSI, ¶ 54). His mother worked often and defendant now realizes, she was working to support them. (PSI, ¶ 53). Romean was good at basketball and played in high school, but his mother could not come to any of his games. (PSI, ¶ 54).

In an interview with Probation, defendant' mother Marsheene Johnson described Romaen as a "loving, friendly and positive" person. (PSI, ¶ 57). Ms. Johnson worked two jobs, which did not provide enough income for their needs. (PSI, ¶ 58).

Defendant attended high school in Brooklyn except for one or two years when he lived with his godmother and attended high school in Lakeland, Florida. (PSI, ¶ 59). Romean ultimately graduated from Boys and Girls High School in Brooklyn as was personally reported to me by the Probation Officer. After high school, Defendant moved on his own to Los Angeles with the intention of applying for college to play basketball. (PSI, ¶ 59). In 2020, Romean attended ASA College in Brooklyn but did not finish due to the COVID-19 pandemic. (PSI, ¶ 75). When he was on bond, Defendant again attended ASA College but was remanded after a half semester.
(PSI, ¶ 75).

Defendant has attended two courses at MDC Brooklyn: "Your Money Values and Influences, " and "Sentry Class (Art)." Copies of the certificates for these classes are attached to the letter. Def. Exs. H and I.

While at MDC Brooklyn, Defendant was cited for "phone abuse," which Romean described as staying on the phone for too long. (PSI, ¶ 60). Defendant stated to me that another charge of "refusing to obey an order" and "being insolent to a staff member" were the same incident as the "phone abuse," infraction. A third infraction for "possession of drugs/alcohol" resulted from his cell mate possessing marijuana. As Romean pointed out, he does not take drugs, including marijuana. (See PSI, ¶ 72 "defendant did not report a history of drug use").

When the Defendant was in high school, he reported suffering from anxiey attacks and depression. While in Florida, he attended mental health treatment, but stopped after a few sessions. (PSI, ¶ 70). After he was shot, Defendant experienced paranoia and post-traumatic stress disorder, as he constantly felt scared that someone was going to hurt him. (PSI, ¶ 67). Defendant reported that his mental health has been negatively impacted by his current incarceration. (PSI, ¶ 68). Defendant was interviewed by medical staff about depression and anxiety. (PSI, ¶ 69). He reported that he experienced an increase in anxiety, nightmares and crying. A second interview occurred in March 2022 and the defendant's mood seemed to have improved. (PSI, ¶ 69). Defendant was diagnosed with generalized anxiety disorder and depression, while out on bond. Romean attended weekly mental health counseling sessions. (PSI, ¶ 70). After his bond was revoked, Defendant was placed on suicide watch. (PSI, ¶ 70).

**Presentence Confinement Conditions At MDC Brooklyn**
**Provide A Basis for A Downward Departure**

Romean has been confined at MDC Brooklyn on a continuing basis since his bail was revoked on October 20, 2022. (PSI, page one, bottom). Throughout his confinement at MDC Brooklyn, conditions at MDC were harsh. There were numerous all-day lockdowns at MDC. See Romean Brown's Certification ("RB Cert."), attached to this letter as Def. Ex. J, ¶¶ 2 – 4. During these lockdowns, Romean and the other inmates were confined to their cells for the day, even though units Romean had been on have common areas. Romean could also not make telephone calls to family, have family visits, or meet with his attorney. RB Cert., Def. Ex. J, ¶ 3. Additionally, Romean has been confined at MDC, and in Los Angeles, when he was arrested on the current charges, during a time of COVID. This heightened Romean's apprehension at being incarcerated.

In addition to the lockdowns, another harsh condition was the food at MDC. Frequently, inmates were served peanut butter and bread or peanut butter and jelly on bread for dinner. No real milk was served, rather, powdered milk was served. RB. Cert., Def. Ex. J, ¶ 5.

The medical attention Romean has received has also been substandard. When he lived in Los Angeles, on November 23, 2021, Romean was shot in the hip by a stray bullet. (PSI, ¶ 62; RB Cert. Def., Ex. J, ¶ 6). Romean was diagnosed with a broken left femur and broken hip. (PSI, ¶ 62; RB Cert. ¶ 6). In Los Angeles, prior to being arrested, Romean underwent two surgeries and a blood transfusion. (PSI, ¶ 62; RB Cert., Def. Ex. J, ¶ 6). When Romean was out on bond, he had scheduled stem cell surgery. (PSI, ¶ 62; RB Cert., Def. Ex. J, ¶ 6). The surgery was not completed because he was remanded. (PSI, ¶ 62). Generally, MDC's treatment was to give Romean Tylenol or Ibuprofen. (See PSI, ¶ 62; RB Cert., Def. Ex. J, ¶ 6). He was never brought to see a doctor for his condition. (See PSI, ¶ 62; RB Cert., Def. Ex. J, ¶ 6). Romean suffers from leg cramps, limping and pain. (See PSI, ¶ 62; RB Cert., Def. Ex. J, ¶ 6). He ranks his pain as 7 out of 10, with 10 being the most painful. (RB Cert., Def. Ex. J, ¶ 6). Romean has requested medical assistance from MDC, but has not been provided help. (See PSI, ¶ 62; RB Cert., Def. Ex. J, ¶ 6). He was never brought to see a doctor. (RB Cert., Def. Ex. J, ¶ 6). Romean's mother confirmed the gunshot wound to Probation and the pain Romean experiences. (PSI, ¶ 62).

"Pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures." U.S. v. Phillibert, 557 F.Supp.3d 456, 460 (S.D.N.Y. 2021)(quoting U.S. v. Carty, 264 F.3d 191, 196-197 (2d Cir. 2001); see also U.S. v. Sanpedro, 352 F.App'x 482, 486 (2d Cir. 2009) (SUMMARY ORDER)(noting that in passing sentence, the district court considered the harsh conditions defendant had experienced in a Colombian jail before being extradited); U.S. v. Torres, No. 01 Cr. 1078, 2005 WL 2087818, *2 (S.D.N.Y. Aug. 30, 2005)("departing downward by 1 level, because of the harsh conditions of defendant's pretrial detention").

A district court "may reduce" the terms of a defendant's imprisonment "if it finds that . . . extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A). The determination as to what constitutes extraordinary and compelling reasons warranting a

reduction is committed to the sound discretion of the district court. U.S. v. Brooker, 976 F.3d 228, 236-237 (2d Cir. 2020). In Brooker, the Second Circuit held that "the First Step Act freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release." Brooker, 976 F.3d at 237. "The only statutory limit on what a court may consider to be extraordinary and compelling is that 'rehabilitation . . . *alone* shall not be considered an extraordinary and compelling reason.' 28 U.S.C. § 994(t) (emphasis supplied)." Brooker, 976 F.3d at 237-238. In Brooker, the Second Circuit noted that defendant did not rely solely on his rehabilitation. Rather, he relied on other factors as well, which "may also interact with the current coronavirus pandemic." Brooker, 976 F.3d at 238 (citing U.S. v. Zukerman, 451 F.Supp.3d, 329, 336 (S.D.N.Y 2020)(granting compassionate release because of the risk of Covid-19); U.S. v. Colvin, 451 F.Supp.3d 237, 241-242 (D. Conn. 2020)(same); U.S. v. Rodriguez, 451 F.Supp.3d 392, 406-407 (E.D. Pa. 2020)(same). The Second Circuit remanded "to allow the district court to consider the possible relevance of these and any other factors, and to exercise the discretion that the First Step Act gives to it." Brooker, 976 F.3d at 238 (see also U.S. v. Torres, 464 F.Supp.3d 651, 659, 662-665 (S.D.N.Y 2020)(granting compassionate release based in part on rehabilitation, exemplary community service and the high risk due to the COVID-19 pandemic).

"Prior to reducing a defendant's term of imprisonment, however, a district court must consider 'the factors set forth in section 3553(a) to the extent that they are applicable.'" U.S. v. Roney, 833 Fed. Appx. 850, *852 (2d Cir. 2020)(SUMMARY ORDER)(quoting 18 U.S.C. 3582(c)(1)(A)).

"The Covid-19 pandemic presents an extraordinary and unprecedented threat to incarcerated individuals." U.S. v. Kissi, 469 F.Supp.3d 21, *32 (E.D.N.Y. 2020)(quoting U.S. v. Williams-Bethea, No. 18-CR-78, 2020 WL 2848098 (S.D.N.Y. Jun. 2, 2020). The Kissi court cited "near-constant lockdown, without access to educational and rehabilitative programs" along with the inability to receive social visits as some of the characteristics of incarceration at MDC Brooklyn that amounted to extraordinary and compelling circumstances warranting compassionate release. Kissi, 469 F.Supp.3d at *39-*40. Judge Engelmayer has stated:

> In the Court's judgment, a day spent in prison under extreme lockdown and in well-founded fear of contracting a once-in-a-century deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison. While such conditions are not intended as punishment, incarceration in such circumstances is, unavoidably, experienced as more punishing.

U.S. v. Mcrae, 17-Cr-643 (PAE), 2021 WL 142277, *5 (S.D.N.Y. Jan. 15, 2021). One court refused to remand a defendant to custody prior to sentencing citing conditions at MDC Brooklyn. U.S. v. Boyd, 21-cr-486 (SHS), 2022 WL 790771, *2 (S.D.N.Y. Feb. 3, 2022)(citing overcrowding at MDC Brooklyn after the closure of the Metropolitan Correctional Center and the inability, at the time, of attorneys to carry on in-person visits to prepare with clients).

For all the reasons just described, the lengthy lockdowns, the bad food, the failure to provided adequate medical care, and incarceration during the COVID-19 era, a downward departure to time served is warranted.

      Mr. Brown was arrested on this Indictment in Los Angeles. He spent 43 days in jail there waiting to be sent to the Eastern District of New York to face these charges. At the time of sentencing on December 12, 2023, Romean will have spent a total of 15 months and five days in jail based on these charges adding together his time in MDC and his time in jail in Los Angeles. That is a sufficient, but not greater than necessary, term of incarceration for Romean. He is a first time offender, his contribution to the losses was minimal, $15,006, and this is a non-violent crime. Justice would be served through a time-served sentence.

<u>Family Situation May Be a Basis for a Departure/Variance</u>

      In addition to the above bases for a downward departure, Probation pointed out that a set of circumstances surrounding Romean's upbringing may warrant a departure/variance. Romean grew up without a father figure and his mother was absent often for work. Probation concludes that the lack of a role model may have led to Romean's poor behavior in school and increased his vulnerability to surround himself with negative peer associations. (PSI, ¶ 104).

**Conclusion**

      For all of the above reasons, we respectfully request a sentence of time-served.

                        Respectfully submitted,

                        Gary L. Cutler, P.C.

            By:     /s/ Gary L. Cutler
                        Gary L. Cutler

cc:    USPO Meghan Wing (via email)
       ASUA Michael Gilbaldi (via email and CM/ECF)